Thank you. We'll call the matter of Clews et al versus County of Schuylkill. Mr. Brennan. Thank you, your honor. It may please the court. I represent the plaintiffs in this matter, the appellate against the County of Schuylkill. But first, I'd like to thank the court for the opportunity to participate for argument in Zoom. It is very much appreciated during these difficult times. No, they are. They are. Go ahead. Well, we all I know, are getting tired of the use of these platforms, but they are the best we have. And they've gotten us by. So thank you for participating. Judge Ambrose. Yes. Yeah, I echo that. The point that I would ask you give the same opportunity to your opposing counsel. Let's assume for the moment, you get the golden opportunity to say, I'm the judge. Here's how I would write the case, not the conclusion. But tell me how I would go about analyzing a case like this, where somebody is talking about a and what are the things that you believe are not important for a court to read to consider? Your honor, I think in this case, in particular, we have to look at the history of the way these positions were treated. Throughout the discovery, the commissioners, the director of personnel, the county administrator, all treated them as if they were county employees. No, no, no. I want you to talk to me generally. Now, this is not your case for the moment. You are the judge and you are now making law for this test. Judge Ambrose, are you asking him to provide us with a test or a prescribed test to apply? It could be. Yes. Right. I think I understand. How does how should a judge go about looking at this in a way that makes sense for this in future cases? So it could be a test. It could be whatever you think. But what would you decide? Again, your honor, I would start with how they were hired. What were they designated when they were hired? Was there a policy established to determine by the employer? Were they exempt, non-exempt? Were they personal staff? How all right. Let me let me jump in there, Mr. Brennan, because you started with a policy. And I'm wondering if that ought to be a starting point. Perhaps shouldn't a starting point, depending upon its existence, be relevant statutory law? I mean, shouldn't we look first to any extant positive law that would speak to it? In the absence of it, obviously move on to other things. But we have a statute here, right? Yes, your honor. And that's an excellent point. Unfortunately, the statute does not define personal staff. And the operative statutes or the enabling statutes of the county code also do not specifically. I understand that. Judge Ambrose is asking about situations of this nature, not this particular case. Granted, there is a statute here in this case. It may or may not be helpful. But we're asking, what do we look to as a test or a formula or a number of factors? What ought to be the inquiry that a court in the first instance applies in determining whether or not this personal staff relationship exists? Again, I would look, as I said at the beginning, how are they designated? How are they hired specifically? And I think the case that we've all referred to, the Tinioka case, I think I pronounced that correctly. They have factors in there that to be considered, but they can't be exhaustive because of the nature of the cases that come before numerous courts. I do believe it was meant to be a guidance, but certainly have to look at the nature of the position as well. Starting out with what were they designated when they were hired? And what's the nature of the position? Is it a policymaking position or confidential position? For example, you often see a judge's clerk or secretary can be considered a confidential position. Let me stop you right there because you've hit on something that interests me. And you are familiar, I assume, with some of the political firing jurisprudence, some of the First Amendment cases, if you will, that have arisen out of people being fired allegedly for expression of political views or for political attachments. And sometimes the nature of the position, that is whether or not it is a policymaking position or sufficiently close in a personal way, that there ought to be a right on the part of the public employer to terminate such a person. Are you suggesting that those principles or even that that case law might be helpful to us? Yes, Your Honor. And I am familiar with those types of analyses. In fact, years ago, I tried a case against the Turnpike Commission, Goodman versus Turnpike. I think, on the panel of the Third Circuit, it was affirmed. And those are the kind of analyses you have to look at. What's the nature of the position? For example, the first deputy of any officeholder, that could be considered a management or policymaking position. Another good example along the same lines, Your Honor, would be the fact that the federal court made it clear that assistant district attorneys can be fired for political reasons. However, assistant public defenders cannot. Public defenders are there to represent individuals in a criminal case. But in some ways, an assistant DA also assists or at least... Are you alluding to the Garcetti case that the Supreme Court decided? I believe, yeah. And I think there's also an Eastern District case, maybe Judge Pott years ago, stated that the assistant DAs can be fired because they set policy. Assistant public defenders cannot. But getting back to Judge Ambrose's position or question, rather, about the test, I do think it is fact-specific in many ways. You have to look at, as I said, how they were hired. What's the nature of the position? Is it truly confidential? Is it something that they make policy? Do they assume the position itself? And I made this argument just by way of example. There's one deputy county coroner who assumes the position of coroner in the absence or vacant position. My clients were probably better classified as investigators, the most current county code. So I really think you have to look at how they were hired, how they were hired. Many of the cases we both discussed in our briefs talk about the nature of the position. And that's where the argument, or I should say... You're really describing the Tenayuga factors. I mean, you're wording them differently, but you're basically citing the same kinds of considerations that the court in Tenayuga looked to. Yes, Ron. And I think the important point in that opinion is that they articulate certain points, some of which are not easily fitted to all positions. And the example I would give, in any small county like ours, your appointed people are going to work closely with the office holder, but because... Well, you raise a good point, Mr. Brennan. I know Schuylkill County pretty well, haven't spent time there in recent years, but knew it well years ago. And it is, in fact, smaller than the county that I reside in, in Pennsylvania, Blair County. How many assistant coroners, how many deputy coroners, rather, do you currently have and existed at the time of the issues that arose in this case? Your Honor, there's only one deputy coroner, Dr. Weber, and then they have... They refer to them deputy coroners, but the more precise would be investigators, although we've, for historical reasons, referred to deputy coroners. But to answer your question, there are many part-time deputy coroners. That number fluctuates. Doesn't the number of those people on staff have some a particular individual is or could be classified as personal staff? I agree, Your Honor. Because I can tell you from my experience in a larger Pennsylvania county, not considerably larger, but a little bit larger than yours, we have, to the best of my knowledge, never had the as investigators or deputies. I'm not sure what are they called, in fact, since you've invoked the word investigator. Well, in my brief, I explained the history of the county code and how years ago they referred to all of them as deputy coroners. Then it was changed where the code allows a coroner to appoint one deputy and whatever staff he needs to do the job. Forensic investigators, that sort of thing. That's basically why I say that they're not really properly referred to today as deputy coroners. It's a lot of magistrate judges. We've had different names over the years. Okay, but doesn't investigator room remove them even farther from a relationship with the coroner himself? Well, my argument, Your Honor, is that they are like a deputy sheriff or a police officer or assessor. They're out in the field doing the work. And you're right, there are a number of them. Now, they're all part-time, so some get called more than others. But at the time of the depositions, I believe there were between 15 and 20 part-time people on the books. Some of them are, for example, funeral directors. Some are EMTs. But my clients were called on a regular basis to act in the field doing the essential functions of the office. The one case I discussed, I mentioned that phrase as part of a factor to consider. If you're simply out in the field doing the essential functions of the office, you're not a management employee, you don't set policy, you don't hire or fire, you don't buy equipment. But yes, you work closely with a coroner. In a small department, that would be the case. A small police department would be the same. Just to latch on to that one factor of the Teneyaka case, that if you work closely, you're therefore exempt, I think would be a disservice. I don't think that's the intent, it was just the dialogue. In fact, to the extent that factor controls, and I'm appreciating this more hearing your presentation and your answering of Chief's questions, some factors that may be highly relevant that's not in Teneyaka, but it's from your discussion today is the size of the jurisdiction. I mean, a very, very small county is going to be very, very different operation than Philadelphia County or Kings County or something like that. Yes, your honor. We're a fourth-class county. Our population is less than 150,000, which means at some point we're going to be reduced in classification. That's the nature of where we are. And it is a small county, a small county courthouse. So just saying you work closely with the officer, but I agree, Judge, that if I were on the Philadelphia police force, I could be a line officer, say even a sergeant. I may never see that or work closely with the head of that department, but this is different. So I think you have to look at the nature of the job, more importantly. And I argued that in my group, where they're doing the essential functions of the office, there was enough indication that they had management authority, et cetera, as I argued earlier. But more importantly, they were treated by the commissioners as people entitled to overtime. They were actually paid overtime during litigation based on the county's calculations. And this relates to my waiver argument. Throughout the pleadings of the discovery, the emphasis was on how many hours did they work? And the record keeping, which is very inadequate here. So a lot of thought and testimony back and forth over how do we track their hours? The question is, how many hours do you spend on an investigation if it's a homicide versus just what appears to be a natural death? The county asked the controller to calculate what they could pay, which they did pay something. So at the very end, after Judge Caput passed away, Judge Wilson got the case, there were some delays. The county filed a motion saying they're personal staff. They were never referred to as personal staff by anybody, including the coroner. In fact, even their policies would indicate a different conclusion. They fired these people because they said we were concerned about the federal overtime rules. Now, if they felt that they wouldn't have to fire them and the testimony throughout indicates they didn't fire for any reason other than the overtime rules. There was another comment by the coroner himself that the county had a policy if you had employees who worked two different jobs, you could not work more than 40 hours in those two jobs. Now, because of overtime, if they had that policy and they applied it to these folks, they must be treating them as people who are entitled to overtime. They can't have it both ways. Mr. Brennan, you hadn't spoken to and we didn't ask you, so maybe it's my fault, but there's an argument here that the county waived the affirmative defense of the personal staff exemption, and I'm wondering how that can be. We have a fairly recent case. In fact, Judge Ambrose and I are well familiar with it at different stages, in fact, of this case in Ray Frascati, and in one of the iterations of that case, we said that waiver is appropriate if the party raising the defense did not do so at a pragmatically sufficient time and if the opposing party would be prejudiced if the defense were that the discovery period was closed when they raised it. All you have to do is ask that it be reopened. Well, but the motion, we had a deadline to file a motion, so motions were filed. In hindsight, yes, that could have been done, but it would still be here before this court if that was denied. The prejudice is the issue. So what did you not get to develop in discovery? Well, for example, I would ask the county why do they feel they had a firearm because of the overtime rules if they felt they were exempt? Why did they apply this policy of you can't work more than 40 hours between two jobs if they thought they were exempt? Didn't you know from the pleadings that there was an affirmative defense being raised? No, your honor, the affirmative defense, I mentioned this, is simply that the minimum wage and overtime rules don't apply. They don't apply. The county said we know we owe the money. We just disagree with you how much we owe them. There was a question we raised too about the rate donation payment. All right, well, I don't think that's going to the affirmative defense questions that I've been asking. Isn't your stronger argument to focus on the second issue of the merits as to whether rather than try to evidence that you had notice that this would be. You broke up a little bit there, Judge, but I did address the personal staff exemption on the merits knowing that that's something we'd have to address. I was not going to come into this court with just that defense saying they waived it. Again, I respectfully submit that there was not a lot of notice that they were going to raise when you consider the tenor of the depositions, their admission that we owe them money. Isn't your time better spent focusing on the second issue, which is whether the court erred in holding that they were included within the personal staff exemption? Yes, your honor, I agree. And if I could switch to that at this point. At this point, I'm saying, your honor, that the evidence whether or not they were personal staff members based on the comments, etc. And I think the lower court simply reached some findings of fact or conclusions saying, for example, that the fact that the corner goes through the county commissioners to ask that the person be terminated. That's a mere formality because they didn't even debate it. They just voted on it. Well, a jury may conclude that ultimately. But at the summary judgment phase, I respectfully submit that the trial judge should not have done that. There is a factual dispute with regard to that. But even on the merits of the personal staff, I believe that if you take the facts that have been developed, you'll see that under these circumstances, these people should not be considered personal staff. Mr. Brennan, you made some reference to a change in judges or a judge leaving the bench or something to that effect. What does that have to do with this? Well, the deadline's passed, your honor. Judge Caputo had a scheduling order and then the I forget the exact dates, but Judge Caputo was originally signed to it. We were proceeding discovery, filing the motions, and then he passed away. Judge Wilson was assigned. How many judges do you have now in Schuylkill County? Well, in the middle district, your honor, we have five sitting judges. Oh, OK. And then we have that. Yeah. Now, this did start, your honor, originally in Schuylkill County, and I did that to toll the statute. And then that's why I asked. I knew that it had provenance in the court of common pleas. And I am actually old enough that I go back and can recall when Mickey Watkins had chambers in the courthouse in Schuylkill County. He was then on Superior Court. That's a long time ago. Yes. Well, and Judge Hutchinson, who sat on your court also. Yes. He did. He did. He had his chambers there at the courthouse as well, as I recall. Judge Ambrose, Judge McKee, further questions before we turn to Mr. Scott? Not really. My question is really better directed to Mr. Scott. And that is, it really seems to me, whether or not the Tenayaku factors control, it seems like such a fact intensive inquiry. Disposing of a summary judgment troubles me, but I can discuss that with Mr. with Mr. Scott better than Mr. Brennan. Thank you. Judge Ambrose, any further questions or defer to rebuttal? No, no, sir. I would defer to rebuttal. Okay, Mr. Scott. Good morning, your honors. Still morning now. May it please the court, frankly and directly, there are no genuine issues of material fact that would merit a remand. So my question, opening question to your opposing counsel, I'm opposing to you now had time to think about it. Forgetting this case for the moment was a test that you would use. The test needs to be initially started with the statute, your honor. Then we look at the regulations that are promulgated. CFR 553 has a discussion about what a member of a personal staff means. And then the Tenayuka factors need to be addressed. It's been referenced by multiple different circuits, including courts, obviously under the jurisdiction have used the Tenayuka factors effectively. But that needs to be the test. And to address counsel's concern regarding how the the deputy coroners were treated. There is no law or statute that let's let's let's let's let's keep coming back to the general for the moment. So if you were to take those six Tenayuka factors and I know the fourth circuit has gone to eight factors, which don't quite only overlap in some part, what would you if you were to you're sitting at a bar and discussing this case, how could you take those Tenayuka factors and condense them down? What would you what would you say they are? Well, if I wanted to condense them down, I would probably eliminate several of the factors. I mean, just generally, I mean, I try to do it to me. It may be level of control. It may be plus the close to the working relationship. But what would you say? Yeah, the level of control was the was the concern that I had. I think that kind of overlaps in relation to the business that overlaps with the reference to the representatives in the chain of command. I think they all are largely duplicative. But because you see the intimacy of the working relationship, same thing, intimacy of the working relationship would go hand in hand with the organizational chain of control and the amount of control. It's really all one in the same. I can't imagine there'd be any situation where there would be somebody who was outside of the chain of command working closely with somebody and they exercise a certain amount of control. So this county is what, about 140,000 people, is that right? Closer to 100. I don't know. Let's say 100. If it's 100,000, I looked at something from a 2004 report from coroner offices. Normally, if you have 250,000 or more, usually more, you may have up to 20 full time personnel, but it seems 20 full time right. Normally, don't we think of personal staff as the people like your assistant, your chief deputy, maybe a filing clerk or something like that? Well, it can be, Your Honor. However, in the case from the Western District, Conley in 2007, we're looking at a director of public safety. That's somebody who's outward facing, not just an inward facing office staff clerical staff. And the court in that situation, used the Teneyooka factors to determine that they were in fact a personal staff of the elected official, the mayor. So the mayor, for example, could fire his secretary and it wouldn't have to be approved by the Board of Commissioners. Is that right? In that situation, I believe that they went through that analysis and yes. And so if it does have to go through the Board of Commissioners, wouldn't that be a counter indication that these people are not personal staff? I believe that this was appropriately addressed, that there is certainly a decision that comes from the elected official and that the Board of Commissioners or whoever the deciding authority is, is a mere formality in that regard. Council referenced in several portions of his brief, the Commissioner's responsibilities as it comes to maintaining the budget. And that certainly is relating to the salary of the same, but hiring and firing is coming directly from the coroner and admitted all by each and every one of the appellants. Why is that mere formality, as you call it, needed here? If, I mean, for example, any objection on our court could just say to judicial assistant, sorry, things aren't working out, you're gone. And I'm sure the coroner could say that to a secretary or an administrative assistant within the office. You don't have to ask anybody pro forma, geez, I just want to let you know, here's what I'm doing. I assume you'll bless this. My understanding is that the way that the county code operates in that situation, that it is a required, but mere formality, but the decision ultimately does come from the elected official. It is in fact, the function of the salary board is effectively to set the salary. And so long as the salary is of an acknowledged amount, the, I don't want to use the word rubber stamp, but the appoint, the appointing power actually is in the hands of the row officer himself, right? That's correct. To what extent does the culture of the locale play into this? It seems to me, and that goes kind of to the size of the locale issue that I asked Mr. Brennan, that that could maybe even be determinative, that in a very, very small community, even smaller than a county of the fourth class, you may have one set of operating understandings, which makes some sense. In a very large, say Manhattan, that would make no sense whatsoever. And to the extent that should be factored in, that really is a very fact intensive inquiry, isn't it? Respectfully, Judge, I don't believe that there has been a court that I've reviewed that has reviewed the size of the jurisdiction. Not yet, not yet. But Your Honor, I think that point, I think that goes into the analysis of the closeness of the relationship. I think we were going to combine those three steps. I think the closest of the relationship really does matter if you're going to go through this analysis. And therefore, you can make a determination because in a small jurisdiction, people are working closely, and they were hired directly by the elected official. I think you can use that in in favor of my argument that in fact, it was a personal staff in larger jurisdictions. There were there have been situations, if you look at the case that was decided out of Colorado, where the Attorney General could not invoke the personal staff exception in relation to an assistant, because there were 140 of them. And this person rarely worked in in conjunction with the Attorney General. But in this situation, we have a smaller use these tests. And this would be obviously a change in the way that any courts have analyzed this to to look at the jurisdiction. But I think it folds into the analysis. These plaintiffs here just ask you, supposedly, clues was terminated, pottering was supposedly terminated, but for some reason stayed on for a while. And the the third person, she was, she's still there. So explain what happened here. Debt Weiler and pottering did stay on for a significant period of time. Albeit, this was subsequent to the commissioners approval of their termination. My understanding is that there was some additional needed help that and they were essentially brought back on. But if we're going to be if if there's a concern over how these people were, how these individual plaintiffs and now appellants were treated, that doesn't go in any way, shape or form towards any law that we've seen that they are. I'm just trying to get the facts. It doesn't didn't make sense that somebody's fired yet stays on and sort of like they ignored it for a while. One question where these persons is true that they were paid overtime for over 40 hours. I'm sorry, say that again, Your Honor. Is it true that they were paid overtime? There were there was an amount that was calculated after the fact after the initial suit was filed to make a determination that they in fact were due and owing some level of overtime. But in relation to the pleadings, we didn't waive that argument at all. It was just asking a factual question. So they they were paid overtime for the work they did part time in conjunction with other work that they did part time within the county. Is that correct? There was some amount. It was not the amount that they were requesting it. And and was the is this was this is the personal secretary to Moylan paid overtime? Your Honor, I don't know the answer to that question. I I would believe that likely if they were working over the 40 hours that they would be. To to some extent, and this is a question I I would like to hear Mr. Brennan speak to as well on on rebuttal to some extent, maybe a great extent. These positions of a personal nature, if you will, personal staff, whatever that means, are going to be defined perhaps to a great extent. By how a row officer structures his or her office and actually operates his or her office. Isn't that true? If that is directed to me, Judge, yes, I believe that that is absolutely correct. And, and I apologize to Judge Amber, I just wanted to circle back around. I do not believe that the personal secretary would I apologize if it came out incorrectly. Okay. Judge Smith, again, to your point, I believe that it does heavily factor on how their their office is structured, based upon closeness of the relationship and how they in fact, utilize these deputies as they were called throughout the litigation, and now we're changing it to investigators, they were deputies. So, so isn't Judge McKee's question really on the mark that if you have a very large office in a large area, to the extent that the Tena Yucca usage of the word intimacy is employed, and personally, I I'm don't particularly like that term in this context, but wondering if maybe an inquiry into confidentiality might be a little bit more on point, but isn't Judge McKee's question, as it was framed, correct, that it could become really a numerical impossibility, not merely impracticability, but impossibility to have this kind of intimate or close or confidential relationship, whatever it may be, with a large contingent of assistance, and consider them personal, as a matter of law, it might be, it might be very impossible to do that, which I think really, again, goes towards the argument that we should be using the Tena Yucca scope of what types of types of situations we're employing the personal higher exceptions. If we're dealing with a large group of hires underneath an elected official, we could go well beyond the intimacy as you want the terminology, but that's what Tena Yucca is about. But in this, in this situation, with the factors that we have, and the case law that we have to rely on, these people work hand in hand with the coroner. The Tena Yucca, two things in Tena Yucca that are noted, one, that this exemption is to be construed narrowly. And the court said also that personal staff inquiry is highly factual, and it doesn't lend itself well to disposition of summary judgment. Why isn't this case just like that? Shouldn't the jury decide this highly factually? I think your honor would be correct if I didn't have so many admissions from the plaintiffs themselves. We, if you review the deposition transcript, which I appended to my supplemental appendix, it almost reads like going through the Tena Yucca factors, one by one about their relationship with the, about the relationship with the elected coroner. I can't even think about where there was a dispute over what these factors had. And if there was a genuine issue of material fact, then yes, it would be a fodder for a jury. Actually, but my point on that is that when I look at the, if you take a look at those six factors, speaking only for myself, I find myself at odds with the district judge on those factors. And to me, if I just look at them, it looks as if they come out on the other side. I'm not sure about concessions or anything like that. To me, it's a highly factual issue. And like Tena Yucca says, it's one that let's not go clearing the deck at summary judgment. Let's let the jury decide. Understood, Your Honor. Again, I was, going through the deposition transcript, it seemed highly odd that where I was going, we got so many concessions relating to each and every one of these factors, especially the closeness of the working relationship between the hiring and firing. But I believe that that's, that does appropriately set itself up for a summary judgment where there isn't really no dispute coming from anywhere as it relates to facts on the opposite end. Well, I mean, I think we're past our time, but I think we could spend the factors and there are really good arguments on the other side on this that the court erred. Understood, Your Honor. At this point, I just wanted to, I know I'm over my time, I just wanted to very quickly raise a waiver argument that I don't believe there was any defense. And in various cases, was there, was there an, well, first of all, was it pled, not necessarily with great specificity, but was an exemption pled as an affirmative defense? Exact terminology, the plaintiffs are not entitled to any recovery in this action because they were and are exempt from the minimum wage and or overtime requirements of the Fair Labor Standards All right. So that's in the amended answer, what you just read from that is in the, the answer. Yes. So at the, so at the close of the pleadings and presumably the pleadings closed either prior to discovery or during the course of discovery, the plaintiffs were on notice that the county was invoking an exemption. Yes. It wasn't specific to the personal. I understand. I, I understand that. So the question is, was it pursued at all by the plaintiffs during discovery? Was it pursued at all by the plaintiffs? Is that, is that what you're asking me? Yes. It was not, to my, to attempt to find out what is the exact exempt, exemption you're claiming? To my knowledge, it was not pursued by the plaintiffs at all, but by and through discovery and the depositions, it was pursued by the defense. All right. So irrespective then of who pursued it, you know, the, the, there was notice then that there was an exemption that was being claimed that could have been pursued exhaustively for that matter during the discovery process. Correct, Your Honor. And to that end, there's been no Okay. Anything further of Mr. Scott, Judge McKee and Judge Ambrose? Nothing for me. If not, Mr. Brennan. Thank you, Your Honor. Let me address some of the things that, getting back to the, it is a factual question. And the deposition transcripts cited by counsel, they're very general phrases. You work closely with Dr. Boylan or Dr. Weber. Well, yes, but it is bottom line, a highly factual nature, not for some replacement motion. And the lower court didn't even address those factual allegations by the commissioners that these people are entitled to overtime. She just, she weighed them and basically concluded that they I respectfully submit that's simply not the case. And as the court pointed out, even the case says it should be narrowly construed, liberally interpreted for the employee and is a factual issue best left to the jury. Again, we submit that that's what happened. Now, what, one of the factors that the court used, and I think this word gets confusing is a plenary power of the role officer to hire and fire. And if you read this, and admittedly, the county code is very complicated. The corner simply doesn't have plenary power. And it gets back to that factual question. Did he have the power to hire anybody? He went through the board of commissioners, they acted on it, they voted on it. And the Commonwealth court stated several times that the position or the decisions of the salary board are not ministerial, they're discretionary. And all right, well, now wait, wait a minute. The salary board sets a salary. And the salary board also approves a hiring. Have you ever known your salary board or rather the salary board in said, no, you're not hiring this person. Salary board say, no, I won't raise the salary for this position, or I will raise the salary position. I would like to know where a row office, a row officer in a fourth class county in the authority to appoint someone where the salary board has set a particular salary, and that salary is acceptable to the row officer. Your Honor, if I may, in the early 80s, I was involved in a case involving the public defender is considered a role office, if you will. But remember, the salary board sets a number of can they hire? They say, I want to hire Joe Smith for this job. Fine. But at that point, there has to be a position available. And I think the case law goes back to how do you define plenary power of this? And the fact is he can't hire any number he wants. And the board does have a discretion to commissioners, as I make mention in my I have never seen that discretion exercised in any way. And I've been away from it. But I've appeared before a county salary board in Pennsylvania, other than with respect to salary, the amount of salary, Your Honor, I do. I agree that most of the time it is is approved. If there's an existing position, there's a vacancy. I have seen one that was Higgins. It is a commissioner I represented, quite frankly, on the salary board. Higgins versus Rubrite was the public defender at the time. And they voted no. Now, they eventually were overturned by Judge Heffner, who was then president judge. Excuse me. My question is, was this the public defender or an assistant public defender? It was the public defender who was. Of course. And if that public defender, as I think you have suggested, is the equivalent of a row officer, certainly not historically in the county code, but is, in fact, running an office and making decisions of hiring or firing, that person has no superior other than the county commissioners, right? Yes. Not the salary board, the county commissioners. Well, all right. I work in conjunction. It gets really complicated. I guess the big point is, does the individual have plenary powers, absolutely unfettered powers to hire any number at any salary? And the answer is no. I think that's part of the factors. And a good example, your honor, why that's. Just a moment, please. That's right. That's absolutely right. But what you just said does no more than go to the amount of salary. And no, a row officer seeking to hire someone has no right or authority, plenary or otherwise, to change, alter, adjust that amount of compensation. That's the function of the salary board. But the hiring and firing is the function of the row officer. Judge McKee, any further questions? Nothing further now. Judge Ambrose, any further questions of Mr. Brennan? No, sir. All right. Thank you very much, counsel. This is, Mr. Brennan referred to the Pennsylvania system as being complicated. I think that's probably true. What I think we can all agree on is it is archaic. It is a very old system, much of which derives from common law. The position of coroner derives from common law and was actually one of the most powerful positions that existed at English common law many, many centuries ago. We've adopted it. And I suppose all that does is give further voice to what Justice Mismanner wrote in an opinion many, many years ago in a completely unrelated area where he said, this is again Pennsylvania bumping along as the caboose in the long train of historical progress. So we'll take this matter under advisement. Thank counsel for their participation. Chief, can we get a transcript? Sure. Sure. We'll have a transcript prepared. Thank you very much. Thank you, counsel. Have a good day. Thank you, Your Honor.